By the Court.
Duer, J.
As this case has been, brought to a hearing only against the defendants, D. Leavitt and J. C. Yandervoort, we are required to determine whether, at the time of the filing of the bill, there was in the possession or under the control of these, defendants, or either of them, any property, money, or things in action, belonging to the firm of J. W. and R. Leavitt, or to either of the partners, out of which the satisfaction of the judgments held by the plaintiffs may be justly decreed.
The bill, after specifying the several judgments held by the plaintiffs, and the return of executions thereon unsatisfied, sets forth that the partners, J. W. Leavitt and R. Leavitt, against whom these judgments were recovered, became insolvent in the month of March, 1845, and that shortly thereafter they executed and delivered to the defendants, upon-certain trusts, several assignments and conveyances of the partnership property and effects, in this state, and in several other states of the Union; and that subsequently they executed and delivered to the defendant, D. Leavitt, as a sole trustee, two other assignments, the last of which was general, and embraces all the real and personal property and things in action, not only of the firm, but of each partner. The bill also alleges, that in the spring or early in the summer of the same year, J. W. Leavitt made a pretended sale and transfer to D. Leavitt of a large amount of household furniture, plate, stock, and other articles belonging to him, in a dwelling-house and farm thereto attached, at Weehawken, in New Jersey; and it avers, that all the assignments and the sale were made with the intent to hinder or delay and defraud the plaintiffs and other creditors of J. W. and R. Leavitt, and upon the truth of this allegation, founds its prayer for the usual relief, the application of the property assigned or sold, or of so much *269 thereof as may be sufficient to the satisfaction of the judgments mentioned in the bill.
The answer of the defendants, which is under oath, admits that J. W; and R. Leavitt became insolvent at the time mentioned in the bill, and that they executed and delivered to the defendants, D. Leavitt and J. C. Yandervoort the several assignments and conveyances (copies of which are annexed to the answer) which are described in the bill; and it sets forth fully the consideration upon which these instruments were founded, and insists upon their validity. It also sets forth fully the circumstances attending the sale of the personal property in New Jersey, and insists upon its validity, and it denies in positive terms, in relation to all the transactions sought to be impeached, the existence of the fraudulent intent which the bill imputes.
Following the order of argument on the part of the plaintiffs, we shall first dispose of the question, whether the plaintiffs are entitled to any relief against D. Leavitt, founded on the sale to him of the personal property in New Jersey, and then consider the grave objections to the validity of the assignments upon which the learned counsel for the plaintiff evidently placed his main reliance.
The material facts in relation to the sale in New Jersey, as we collect them from the pleadings and proofs, are as follows: D. Leavitt, in the month of June, 1845, agreed to purchase the property in question at its appraised value, and to give credit for the amount upon the large debt due to him from the firm. In pursuance of the agreement, the goods were appraised at the sum of two thousand three hundred and nineteen dollars and sixty-nine cents, and the stipulated credit was given to J. W. and R. Leavitt for that amount; but the only delivery of the goods was purely symbolical; there was no actual change of possession, but J. W. Leavitt retained them, under a promise to pay rent for their use. No such rent, however, was ever paid or demanded; and all the property, which the sale embraced, was still in the sole possession of J. W. Leavitt when the bill was filed.
Upon this state of facts, whatever may be the conclusion of *270 law as to the validity of the sale, we are satisfied that we have no right to make the decree required by the plaintiffs. Should we decide that the sale, as against creditors, was fraudulent and void under our own or the New Jersey statute of frauds, the decision would be of no importance to the plaintiffs, since it would give them no title to relief against the defendant, D. Leavitt; and in respect to this transaction, it is against him only that relief is now asked or can be given. If the sale, upon the ground that there was no actual change of possession, was fraudulent in judgment of law, the only consequence is, that as against his creditors, the goods remained the property of the debtor, and as such, were liable to be seized in execution, and perhaps, had they remained in his possession until a decree, this court would have had power to order their delivery by him to a receiver. But it has certainly never been decided, nor, we imagine, until now, suggested, that where the only evidence of fraud in a sale by a debtor, is his continued possession- of the property sold, the vendee, into whose hands it has never passed, is yet liable to account to the creditors for its value; nor have we been able to discover that there is any principle of law or equity, upon which such a claim can be founded. It may be, that in such cases the creditors have an election; they may affirm the sale, and consider the purchase money, if unpaid, as a subsisting debt; or, impeaching the sale as fraudulent, they may follow the goods or their proceeds; but when the purchase money has been paid, they cannot treat the vendee as a debtor; and still less, when he has not received the goods, can they hold him to be liable for their value. Hence, the sale in New Jersey, as set forth in the bill, affords to the plaintiffs no ground of complaint whatever, as against the defendant, D. Leavitt. If it was a valid transfer, it gave rise to no debt, for there was an immediate payment of the price; the credit that was given was a payment just as effectual as the delivery of cash. If the sale was void as fraudulent, it had no effect whatever on the rights or remedies of the plaintiffs and other creditors; for as the title and possession of the debtor were unchanged, they had all the means which they ever possessed for compelling him to apply *271 the property to the satisfaction of his debts. Nor' is this all the plaintiffs, as partnership creditors, derived an actual benefit from the transaction, since, if otherwise invalid, its necessary effect was to enlarge the primary fund, out of which their judgments, if paid at all, must be satisfied. The defendant, D. Leavitt, would never be permitted to annul the credit which he has given. To the extent of that credit, the debt due to him by J. W. and.R. Leavitt has been diminished, and the partnership assets applicable to the payment of the other creditors, in the same proportion increased.
It is true that it appears from the answer, that in the interval between the filing of the bill and the answer, the property at Weehawken came into the actual possession of D. Leavitt; and it appears from the testimony that the whole or the greater part of it has since been sold by him, and we are bound to presume that he has received the proceeds; but whether these facts would justify a decree against him in favor of the plaintiffs, is a question that in the actual state of the pleadings we have no right to consider, and upon which we shall therefore forbear to express an opinion. We can make no decree that shall not correspond with the allegations in the bill, that is, no decree that the allegations in the bill, if proved to be true, would fail to warrant; and if the plaintiffs meant to rely on the facts that have been stated, as a distinct and substantive ground of relief, they should have brought them before us, by proper allegations, in a supplemental bill.
In conclusion, a judgment creditor can only entitle himself to the relief which the statute provides, by averring in his bill and establishing by proofs, that at the time of the filing of the bill “personal property, money or things in action belonging to the debtor, or held in trust for him, were in the possession or under the control of the defendant against whom a decree is sought.” (2 R. S. 174, § 38 and 39.) And in this case, the necessary facts, so far as they relate to the sale of the personal property in New Jersey, and the defendants now before us, are neither averred in the bill, nor established by the proofs.
*272 We shall next proceed to state and consider the objections upon which the learned counsel for the plaintiffs so forcibly insisted to the validity of the several conveyances and assignments, which are set forth in the bill, and admitted by the answer. It is insisted that these instruments are all of them void upon their face, as containing provisions which, in judgment of law, are conclusive evidence of an intent to hinder, delay, and defraud creditors ; and it is urged that there is additional proof from extrinsic facts, that such was the actual intent of the parties. The extrinsic facts which have been relied on as satisfactory evidence of a fraudulent intent, relate — First, to the employment by the defendants, as trustees, of John W. Leavitt, as their agént in- the management of the trust property and the collection of the debts assigned, and the sums paid to him for his services; and next, to the judgment, which after the assignments had* all been executed, was confessed by J. W. and R. Leavitt to D. Leavitt, and was followed by the filing of a creditors’ bill and the appointment of a receiver. The two classes of facts will be considered in the order in which they have been named. First, it is undeniably true that the defendants have employed J. W. Leavitt as their agent, and have paid to him as such, in addition to his travelling expenses, a considerable sum as a compensation for his services; these facts are fully stated in the answer, but standing alone, they are assuredly no evidence conclusive or presumptive of an intent to defraud the creditors. A different construction might, perhaps, have been given to them, had there been no just reason for the employment of an agent, or the sums allowed to him had been plainly extravagant as compared with the services performed; but the facts were far otherwise: The business of the mercantile firm of J. W. & R. Leavitt had been very extensive, and, as a natural consequence, its assets, at the time of its failure, were widely dispersed. There were debts owing and property belonging to the firm in nearly every one of the western and southwestern states of the Union; hence the employment of a suitable travelling agent to aid the trustees in collecting the debts and in realizing and concentrating the assets of the firm, . was certainly an expedient and probably a necessary measure. *273 J. W. Leavitt had probably a more intimate knowledge than any other person of the business of the firm, and of the situation and value of its assets; and as the defendants allege, and we see no reason to doubt, that they reposed an entire confidence in his capacity, diligence, and probity, it Avas not merely their right but their duty to employ him. Such in substance are the reasons for employing him, set forth by the defendants in their answer; these reasons are not contradicted but confirmed by the evidence, and, in our opinion, they amply justify the act.
The law may probably be considered as settled, that an insolvent debtor making an assignment, has no right to secure a beneficial provision for himself, out of the property assigned, during the continuance of the trust, and that such a condition or stipulation inserted in the deed is an evidence of fraud that renders it wholly void. Hence, had it been proved in this case that the employment as an agent of J. W. Leavitt, at- a salary, to be paid to him out of the property assigned, had been made by him a condition of executing the assignment; or that there was a prior positive agreement or engagement, not a mere expectation or belief, that he should be so employed, it probably would have been our duty, following the principle of former decisions, to consider the facts as sufficient, if not conclusive, evidence of a fraudulent intent. But the defendants, in their answer, while they admit that there were conversations upon the subject, have positively sworn that no such condition was exacted, nor agreement made, nor promise given, and they are not contradicted by any evidence, direct or circumstantial. Hence we are bound to conclude that their choice of J. W. Leavitt was unconstrained and voluntary ; and resulted solely from their own sense of its expediency. It was therefore a valid exercise of the discretion which, as trustees, they undoubtedly possessed. Whether the sum which was'allowed and paid to J. W. Leavitt, in addition to his travelling expenses, was more than a reasonable compensation for his services, is a question that may hereafter arise upon a final settlement of the accounts of the defendants ;• but it is not at all necessary that we should now consider it, since there is no pretence for saying that the *274 allowance Vas so excessive as to lend any color of probability to tbe imputation of fraud.
Second, it is not to be denied, when we look at tbe relative situation of the parties at the time, that the confession of the judgment to D. Leavitt, with the view of enabling him to file a creditors’ bill, the actual filing of such a bill, and the subsequent appointment of a receiver, were singular proceedings, and were well calculated to excite the suspicions of other creditors. When the-judgment'was confessed, J. W. and R. Leavitt had conveyed and assigned, not only all the property and effects of the partnership, but all the real and personal estate of each partner; and as D. Leavitt was a preferred creditor in every one of these assignments, he would seem to have obtained not only all the security that he could reasonably ask, but all that it was possible for the debtors to give him; and upon what grounds it was supposed that any addition would be made to his security by the judgment and the proceedings that followed, we own that we have not been able clearly to understand; still, had we been' left without any explanation as to the motives of the parties in these proceedings, we could only say that they ■vyere incomprehensible, and, as it appeared to us, wholly useless. We do not see that we could have been justified in giving to them a retroactive effect, by regarding them as evidence of an original fraudulent intent, infecting and vitiating all the prior assignments. It may be that the judgment and creditors’ bill, as against other creditors, were erroneous and void proceedings ; and upon the principle of the decision in Machie v. Cairns, they certainly were so; but we do not see that their invalidity could affect the prior‘assignments, which must stand or fall by the legality of their own provisions, and by the state of facts which existed at the time they were delivered. It is not, however, upon this reply to the arguments that were addressed to us, that we mean to rest. Mr. Leavitt has positively sworn in his answer, that all the proceedings in question were suggested and directed by his counsel; that throughout these transactions he was solely governed by their advice; and'that such were the facts, the testimony of Mr. Larocque, one of his counsel, con *275 clusively proves. Whether the advice thus given was judicious and prudent, it is needless to inquire. It is impossible to doubt that it was given in good faith by the counsel, and followed in good faith by their client; and this is alone sufficient to repel the imputation, or even the suspicion of fraud. We cannot doubt that the counsel themselves believed that the measures which they advised would, or might, have some effect in securing to their client the preference which his debtors desired to give him, and which, according to the decisions, they had the right to give; and there is as little reason to doubt, that in adopting these measures, the client was equally arid solely influenced by the same belief. The existence of this belief excludes the supposition of intentional fraud. These are all the observations that we design to make upon the force and bearing of the extrinsic facts that have been appealed to as evidence of fraud; and the result is, that in the best exercise of our judgment,. we must reject the conclusion which they were supposed to justify.
The only questions, therefore, that remain to be considered, are those which appear upon the face, and arise upon the terms of the several instruments of conveyance and assignment, which we are required to vacate, and it was to the examination of these questions that the efforts of the counsel upon both sides were mainly directed.
Before we enter upon this discussion, however, it is proper to remark, that we shall not embrace within its scope those deeds of assignment which were designed to operate as conveyances of the real property of the firm, and of each partner, in Louisiana, Alabama, and other states of the Union. There is no ground whatever for the assertion that these deeds contain any provisions that would render them void at common law; but the objections to their validity, as we understand them, rest solely upon the construction that it is alleged has been given in our own courts, to our own statute of frauds. There is no evidence, however, that there is any similar statute or similar train of decisions in each or any one of the states in which the lands conveyed or attempted to be conveyed are situate, and that in the *276 entire absence of this evidence, we have no right to express a judicial opinion upon the validity or legal operation and effects of those conveyances, is a proposition so manifestly true, that we could never have expected it would be drawn into question. If it is possible to state any legal proposition or maxim that has never been the subject of dispute or doubt, but which is proclaimed and established by the unbroken and unvarying harmony of the decisions in England and the United States j -it is, that the validity of every disposition of lands, whether the disposition be absolute or qualified, whether it passes an estate or merely imposes a charge, depends exclusively upon the municipal law of the country or state in which the lands are situate. (Story, Conflict of Laws, p. 860, § 428, m. 3, et cit) It is of no consequence where the instrument containing the disposition is made or delivered, nor where the parties reside, since in all cases it is neither the “ lex loci contractus, nor the lex domicilii, but solely' the lex loci rei sitce” that governs the construction; and so universal is the rule, that neither in the law of England nor in our own, (although it seems to be otherwise in some foreign countries,) has a solitary exception ever been admitted. It is a necessary consequence, that no court of law or equity can found a judgment or decree upon the construction that it may give to a grant or conveyance of lands not within its own jurisdiction, unless upon positive evidence that the construction which it adopts is in entire conformity to the local law upon which the validity and effect of the instrument depend. The cases that were cited upon this subject by the learned counsel for the plaintiffs, Penn v. Lord Baltimore, Ward v. Arredondo, and other cases, have in reality no application. It is undoubted law that a court of equity may compel the specific performance of a contract for the partition or sale of lands lying within a foreign jurisdiction, and by the exercise of its own jurisdiction over the person of the defendant, compel him to execute the necessary conveyance; but it by no means follows, and we wholly deny, that where a conveyance of lands thus situated has been executed, and the sole question to be determined relates to its validity, or to that of some of its provisions, a court of equity *277 can proceed by its decree to determine the question and tbe rights of the parties, without any proof whatever, of the foreign law by which alone its decision ought to be governed. We are persuaded that no such decree has ever been made, no such power exercised or claimed; and had such a precedent been cited, we must have rejected it as a violation of principle and an unauthorized and dangerous innovation.
The learned counsel for the plaintiffs, feeling the pressure of the objection upon which we have dwelt, admitted that we cannot declare the conveyances in question to be wholly void, but must hold them to have been so far operative as to have vested in the defendants, as trustees, a legal title to the lands which they embrace; but he insisted, that in order to defeat the fraudulent intent which the provisions in those instruments are said to manifest, we may justly construe them to have created a trust for the equal benefit of all the creditors, and upon this ground, decree the lands to be conveyed, or if sold, the proceeds to be paid over to a receiver; but a slight consideration is sufficient to prove, that the objection to the exercise by us of any jurisdiction over the subject is not at all removed, nor its force or application in any degree lessened, by the course which the counsel has suggested. If the conveyances in question are valid as to the legal estate which they purport to convey,, we have no right to say that they are not just as valid as to any trust and equitable interest which, in terms, they create; and if we cannot destroy the legal title, we cannot extinguish or alter the trust. If the conveyances are valid at all, we have no right to say that they are not valid in every clause or provision that they contain, since the validity of each provision, singly considered, just as certainly depends upon a foreign law of which we are ignorant, as that of the entire instrument. In truth, we have no right to say whether a legal estate has or has not passed, or whether a valid trust has’ or has not been created. We have been left without the necessary knowledge, and consequently have not the power of decision.
So far we have placed our refusal to express any opinion upon the validity or construction 'of the conveyances in ques *278 tion, upon the absence of the proof which, if it exists, the plaintiffs, in requiring our decision, were bound to give. But we go further: if the proof in question had been offered, we are- of opinion, that upon a bill, framed like the present, it could not properly have been received; or if received, could not have been made the foundation of any relief to which the plaintiffs, upon such a bill, can be entitled. The present bill, so far as it seeks a satisfaction out of the real property of J. W. and R. Leavitt in other states of the Union, and for that purpose to set aside the conveyances made to the defendants, is not founded upon the statute, for -the remedy of the judgment-creditor by the express words of the statute, as we have already seen, is limited to a satisfaction out of “ the personal property, money, or things in action, belonging to the debtor, or held in trust for him.” And it is in respect to these, and these only, that the creditor, by filing a bill, acquires a lien, or more correctly speaking, a preference over other creditors in the order of payment. The statute, neither by its terms nor by any reasonable construction, gives any new or additional remedy to the judgment-creditor against the lands or other real estate of the defen d-ant. It neither creates nor empowers him to create any lien that did not previously exist. Hence, if, when the present bill was filed, a court of equity in this state could rightfully compel the satisfaction of a judgment out of the lands of the debtor, whether in his own possession, or that of a fraudulent grantee, in other states of the Union, it is not in any existing statute, we affirm with confidence, that any grant or recognition of the power can be found; yet, it seems to us exceedingly clear, that unless the power was given by statute, it never existed. This extraordinary power certainly never belonged to our former court of chancery, in the exercise of its rightful common law jurisdiction. It'is true that a judgment-creditor in this state has at all times been entitled to be relieved in equity against a prior fraudulent conveyance of real estate, made by the debtor, and against a fraudulent incumbrance thereon, whether by mortgage, judgment, or otherwise created or confessed by the debtor; but the very, foundation of the relief in these cases has *279 always been, that the fraudulent deed or incumbrance sought to be removed, by obscuring and perplexing the title, prevented the creditor from enforcing the lien which, by his judgment, had been acquired. The existence of the lien is a necessary ground of the relief; and hence it has invariably been held, that it is only to a judgment-creditor or mortgagee that the relief can be granted. A general creditor, it is settled, has no right to maintain the suit. It follows, that a judgment-creditor whose judgment has been obtained in this state, has no right to maintain the suit when it relates to the lands of the debtor in a different state; lands upon which his judgment has never attached, and against which it can never be enforced. He cannot maintain the suit, since, in respect to such lands, he stands exactly in the situation of a general creditor. It may be, that under the broad provisions of our new code, a judgment-creditor may reach the real property of the debtor out of the state; but our conviction is, that until the code was enacted, no such proceeding was known to our law.
Although, upon all the grounds that have now been stated, we must reject from our consideration the assignments in question ; it so happens that the plaintiffs, if really entitled to the relief which they seek, cannot be prejudiced by our decision. So far as their rights and interests are concerned, it is not necessary that we should examine the prior assignments at all, but may confine our attention to the general assignment made to D. Leavitt alone, on the 31st July, 1845, which embraces all the real property and estate of the partners, and of each of them, not previously conveyed or assigned. This assignment contains all the provisions which we have been urged to consider as conclusive evidence of the intent of the parties to defraud, hinder, or delay their creditors; and if these provisions rendered it void, the money and securities that must be passed from the assignee to a receiver will constitute a fund far more than sufficient to satisfy the judgments of the plaintiffs.
The provisions in this assignment, which, as illegal and fraudulent, are deemed to be fatal to its validity, are — First, the dis *280 cretionary power given to the assignee to sell the whole or any part of the property assigned upon credit; and, second, the declaration that the proceeds of the assignment are to be applied to the payment not only of the partnership debts, but of such as may be due to D. Leavitt from either of the partners.
■ In considering the questions that have been raised upon these provisions, we shall endeavor to lay aside-the unfavorable impressions which, we confess, have been made upon our own minds by the general character and objects of the assignment. It is not an assignment that a court of equity can feel any desire to sustain ; not such as an insolvent merchant, anxious to do justice to his creditors, is bound in conscience to make. Its object is not to secure a full and equal distribution of the partnership assets amongst the creditors, by preventing any from obtaining by judgments, attachments, or otherwise, a prior lien or right of satisfaction. Its object, we regret to say, is directly the reverse. It looks not to the interest of all the creditors, but mainly to to those of a single individual. The chief design of the partners in this and in all the assignments that preceded it, evidently was to protect, to the extent of their ability, their relative and confidential friend, D. Leavitt, against any hazard of an ultimate loss. Hence the liabilities incurred by him on account of the firm, and the debts due to him and to a few other creditors, are in the first place to be satisfied in full, and it is only in a remote possible surplus that the body of the creditors are entitled to share. These are the provisions which, as marring the equity of the instrument, we regard with no slight disfavor. The preference which they create in the order of payment, and which, while it probably secures the favored creditors to the full extent of their demands, leaves to those who remain only a faint hope and doubtful chance of a miserable dividend, we condemn as a positive injustice, and lament that the law has denied to us the power of redressing the wrong. We know that the custom of giving such preferences has extensively prevailed, and is warranted in a measure by public opinion as well as by the decisions of our courts; but we are not the less persuaded that *281 it is forbidden by public policy, and is inconsistent with a sound morality.
From an early day it has been a favorite maxim in the court of chancery, that amongst creditors “equality is justice;” nor has this maxim been treated as a barren speculative truth. It has not been suffered to remain inert and lifeless, but the powers of the court in many cases are vigorously exerted to enforce its practical observance. It is plain, however, that this maxim, at once a principle and a rule of equity, is never more grossly violated than when an assignment which sacrifices the interests of the mass of creditors to the protection of a few, is admitted to be valid; • nor while we lament shall we attempt to explain the anomaly which has permitted this violation in the very court in which the doctrine it partially subverts has long prevailed, and in other and analogous cases it has constantly enforced.
It is true that the debts preferred are usually considered and termed by the parties honorable and confidential, and these deceptive terms doubtless conceal from many, the mischiefs and the immorality of the system. But whether the terms are justly applied, is a different question. There is, indeed, a mutual confidence and understanding when the debts are contracted. The friendly creditor lends his money or credit to furnish the capital which the borrower needs, in the confidence, express or implied, that he shall incur no risk from the insolvency of the debtor, but that in all events, whatever may be the losses and sufferings of others, he shall be protected. But a secret confidence, by which the public is deceived, and creditors, excluded from its knowledge and benefits, made the victims of their credulity and ignorance; a confidence, which in respect to third persons is a source of delusion and an instrument of fraud; assuredly deserves any other name than that of honorable. It is not an agreement, that it implies, but a conspiracy. It must not be imagined that we are alone in these opinions. The same views in substance have been expressed by two of the most eminent judges of our highest national court, Justices Story and Baldwin, and in our own state by Chief Justice Nelson and Chancellor Walworth, and other distinguished jurists; and the *282 experience of each succeeding year adds to the evidence of their .truth. Hence we do not hesitate to say, that were we at liberty to follow our conviction, we should rejoice to make the decree which the plaintiffs' require.
But we have no such liberty. The right of an insolvent debtor in -making an assignment for the benefit of his creditors, to secure a priority in the order of payment to any -particular creditor or class of creditors, is firmly established by a long series of decisions. It is now, the undoubted law of the state, and however serious maybe the conviction of judges, that the allowance of the practice tends to injustice and tempts to fraud, the legislature alone is competent to apply the remedy. Until the existing law shall have been altered by the action of the national or state legislature, our jurisprudence must remain liable to the reproach- that we are the only nation in the civilized world, in which a merchant, knowing or contemplating his insolvency, is-allowed to place his whole property beyond the reach of the body of his creditors, by devoting its avails, principally or exclusively, to the satisfaction of the claims of a few. In every civilized country but our own, it is not only a truth in morals, but a rule in law, that the property of an insolvent debtor belongs to his creditors in the proportion of their debts, and that every disposition made by him, in contravention of their equal rights, is null and void.
As the condition of our law, however, compels us to say that those provisions in this assignment which we would willingly exclude, are certainly valid; it is clear that we ought not to permit them to affect our construction of other provisions, which, separately considered, we should regard as beneficial or harmless. If the power given to the assignee to sell for cash or upon credit, in his discretion, is no evidence of a fraudulent intent, when the assignment is.for the equal benefit of all the creditors, we can perceive no ground for saying, that where a distinction is made in the order of payment, a different construction ought to be adopted. If the power is proper or innocent in the one case, it must be so in the other; or if there is any difference, it is when preferences are given that the body of the creditors *283 have the least reason to complain that the power is granted; since, in this case, it is probable that they especially will be benefited by its exercise, as its judicious exercise may be the only means of creating a surplus. At any rate, the mere fact that two provisions, independent in their nature, are found in the same instrument, can never avail to stamp upon them, or either of them, the character of fraud, when the provisions, separately construed, are admitted to be lawful.
This remark is so obviously just, that it may seem unnecessary to have been made; yet, such is its pertinency, that we are satisfied, that had assignments for the benefit, without distinction, of all the creditors been alone permitted, the propriety of giving an authority to the assignee to sell upon credit, would never have been doubted. Still less would the validity of the power, when given, have been drawn in question. That question, however, for in substance it is the same, is now raised, and must be determined; and we are bound to yield our conviction to the arguments and authorities upon which the counsel for the plaintiffs insisted, if they in reality possess the force which he evidently believed to belong to them. We shall state succinctly the reasoning of the learned counsel, as we understood him. It is not necessary, he contended, in order to enable creditors to set aside a conveyance or assignment made by the debtor, that an actual intent to defraud the creditors should be averred or proved. The words in the statute of frauds are in the alternative, “hinder, delay, or defraud,” (2 R. S. 137.) The intent to hinder or delay is as much prohibited by the statute as the intent to defraud; and consequently, when apparent or proved, must have the same effect, that is, must be just as fatal to the validity of the instrument to which it applies. But the intent of the debtor to hinder or delay his creditors, must always be implied where such is the necessary effect of any provision in the instrument of assignment, or of the exercise of any authority or power which the instrument confers. An authority, therefore, given to the assignee to sell upon credit is conclusive evidence of such an intent, since the necessary effect of the exercise of the power is to hinder and delay the creditors, by compelling *284 them to wait for the whole or a portion of their dividends, until the term of credit shall have expired. The right of the creditors is to have the property sold immediately, and for cash; consequently, a direction or authority to postpone the sale, or to sell upon credit, is a hinderance or delay in violation of their rights; and as such, although given and meant to be exercised for their benefit, and therefore wholly free from the imputation of fraud, vitiates and nullifies the assignment.
This reasoning, it is not to be denied, wears a face of plausibility, but it is very far from commanding our assent. On the contrary, we are constrained to deny both its premises and its conclusion. It proceeds upon a construction of the statute that we wholly reject; and were this construction admitted to be true, it would not control our decision, since the necessary consequence of a sale upon credit is by no means such as the argument implies.
First, as to the construction of the statute. It is not true, that where there is no evidence of a fraudulent intent, every assignment by an insolvent must be held to be void, if the necessary effect of its provisions, or of any of them, is to hinder and delay the creditors, in the sense, in which the words were understood by the counsel; for to, assert this, as the true construction of the statute, is to affirm that no valid assignment by an insolvent of all his property, in trust for his creditors, has ever been made; or so long as the statute shall remain in force, can be made. The necessary effect of every such general assignment, even where the creditors are to be paid pari passu, is to hinder and delay them in the collection of their debts, by withdrawing the property from the reach of any legal process to which they might wish to resort. Not only is such its necessary effect, but the actual intent of the debtor is to place the property beyond the immediate power and action of his creditors, by preventing them from obtaining any judgments by which it may be bound, or from issuing any execution or attachments under which it may be sold. He means to hinder the creditors from collecting their debts out of his property by any proceedings against *285 himself as their debtor, and to delay them from receiving any portion of their debts' until they shall become entitled to a dividend under the assignment, and the intent thus to hinder and delay them, is not only to' be plainly deduced from the nature of the trust, but not unfrequently is confessed-in its terms. In fact, it was upon this very ground, the apparent and certain intent to hinder and delay the creditors, that originally the validity of a general assignment, although for the benefit of all the creditors, without distinction, was not only seriously doubted, but seriously contested. In an early case, in which the action was brought by the assignee against a sheriff, who, by virtue' of an execution against the debtor, had levied upon the property assigned, and in which, it appeared in evidence, that the assignment had been executed and delivered only a few, days before the judgment was recovéred, the judge who tried the cause instructed the jury, that if they believed from the evidence that the intent of the debtor, in making the assignment, was to defeat the remedy of the creditor, under the judgment, it would be their duty to find a. verdict for the defendant; and the jury, being satisfied that such was the intent, followed in their verdict the direction that was given; yet, in this very case, the court of King’s Bench, notwithstanding the intent to hinder and delay had been expressly found by’the jury, held the assignment to be valid, and upon that ground set' aside the verdict as contrary to law; (Pickstock v. Lyster, 3 M. & S. 371; and see Braddock v. Watson, 9 Price, 6;) and from that time to the present, so far as we have been able' to discover, neither in the English courts nor in our own, has the validity of similar assignments ever been questioned.
' It seems, however, impossible to deny, that these decisions are a plain violation of the'statute of frauds, if we look merely'to the words of the statute, and understand them in their literal extent. The words of our present statute (and those of the English statute, and of the former acts of our legislature upon the subject are substantially the same) are, “that every assignment made with the intent to hinder, delay, or defraud creditors of their lawful suits, damages, debts and demands, as against the *286 persons so hindered, &c., shall be void,” (2 R. S. 137, § 1,) and yet, the courts have held, and the law is established, that although the intent to deprive all or particular creditors of their lawful suits, and hinder or delay them in the recovery of their just demands, is confessed or proved, still the assignment, if by its terms all the property which it embraces must be applied ratably or' otherwise to the payment of all the. debts, must be sustained. It is not void, even as against the persons, who, in fact, are very materially hindered and delayed, and were meant to be so. It is valid even against the creditors whom it deprives, and was intended to deprive, of that full satisfaction of their debts, which, by their superior diligence in prosecuting their suits, they would otherwise have certainly obtained. The explanation is, that although in these cases the intent to hinder and delay the creditors is manifest, it is just as certain that there was no intent to cheat or defraud "them; and the reasonable construction of the statute is, that it is only such a hinderance or delay as was intended to operate, or, if permitted, could operate as a fraud upon the creditors, that was meant to be prohibited. All the law can reasonably demand of a debtor is the faithful application of his entire property to the satisfaction of all his debts; and where by the terms of the assignment, this is secured, the hinderance or delay which they create, however they may operate to the prejudice of particular creditors, are disregarded, since, in reality, they are only the necessary means of accomplishing a justifiable and lawful end. They fall, it is true, within the words of the statute; but as they are free from the imputation of fraud, and produce-no benefit to the debtor at the expense of the creditors, they are not embraced within its meaning, and are justly excluded from its operation. It is perhaps needless to sustain these remarks by reference to particular .cases, since the truth of that construction of the statute which they assert is necessarily implied in every decision, by which an assignment made by a debtor, with a knowledge or in contemplation of his insolvency, has been adjudged to be valid. The cases, however, of Muir v. Howell, in the King’s Bench, (4 East. 1,) and of Wilder v. Winne, in the supreme court, and subse *287 quently in the court of errors, (6 Co wen, 284; S. C. 4 Wend. 100,) are express decisions that a hinderance or delay, which, although intentional, is not fraudulent, is no violation of the statute.
There are one or two observations which the terms of the statute in its revised form forcibly suggest, that it may not be useless to add. While the statute of frauds retained its original form, the doubt was not unreasonable, whether the intent to hinder and delay creditors, as distinguished from and excluding the intent to defraud them, was not alone sufficient to vitiate an assignment; but this construction, as it seems to us, is positively excluded by the new provisions of the statute. It is excluded by the section which declares, that the question of fraudulent intent, in all.cases arising under the provisions of the chapter, shall be deemed a question of fact and not of law, (2 R. S. 137, § 4,) thus plainly considering that question as in all cases the question necessary to be determined, in judging of the validity of a conveyance or assignment, as consistent or inconsistent with the provisions of the chapter. Should it be said that the intent to hinder and delay creditors is a fraudulent intent in judgment of law, and therefore embraced by the new provisions of the statute; the reply is, that in adopting such an interpretation, we should re-establish the doctrine of constructive fraud, a doctrine which, we have certain evidence that the revisers and the legislature, in conformity to the opinions delivered in the court of errors, in Verplanck v. Sterry, (12 John. 555,) and in Jackson v. Seward, (8 Cowen, 406,) designed to abolish, and which the section that we have read, if construed according to the intentions of its authors, does effectually abolish. (3 R. S. 2 ed. note of Rev. p. 658. Vide also the observations of Ch. J. Nelson in Cunningham v. Freeborn, 11 Wend. 251.) It may be that the doctrine thus meant to be exploded has been in a measure revived by some modern decisions; but we are satisfied, that to revive the doctrine, is to repeal the statute. A constructive fraud was necessarily a question of law. It was a fraud that the judges, in construing the provisions of a conveyance or assignment, presumed to exist, not only without evidence that it was *288 intended by the parties, but even in cases where no such intention could have existed, as. where a voluntary conveyance by a solvent grantor was held to be fraudulent, as against .subsequent creditors or purchasers; but the intent to defraud, considered as a question not of law but of fact, can only mean the intent actually existing in the mind of the party at- the time of :the performance of the act which it is alleged to vitiate. In respect to creditors, a fraudulent intent existing in .the, mind and vitiating the act of the debtor, can only, mean that his rbal design, apparent or covert, in making a conveyance or assignment, was to prevent the application of the property in,whole or in part to' the satisfaction of his debts; and consequently, when the-object of a provision by which the creditors may possibly be delayed, is not to defeat or evade, but to render more- certain the payment of their demands, it is an .abuse of reasoning and a perversion of language, to construe the provision as, evidence of his intent to defraud them;
These general remarks, it is readily seen, involve, in a great measure, our decision of the particular question now under consideration. Let it be admitted that the exercise of a discretionary power to sell upon credit may create a delay in the payment of dividends to creditors, yet, unless the gr.ant of the power- is conclusive evidence of an intent to defraud- them, and. this not an intent which the. law raises by construction, but which we are required to believe, and must believe existed, as a fact, the admission that they were meant t'o be delayed is wholly immaterial. It is wholly immaterial, unless an intent to delay and an intent to defraud are identical or inseparable. If from the nature of a power to sell upon credit it could only be exercised for the benefit of the debtor, at the expense of the creditor, or if it is proved that there was a secret agreement, that it should be exercised for such a purpose, in either case the grant of the. power might be justly construed as an intentional fraud; but that there was any such agreement between the debtor and the assignee in the present case, is not alleged, nor, we presume, suspected; nor is it pretended that the debtors could derive any other advantage from the exercise of the power, -than-by. its ren *289 dering the property assigned more extensively available to the satisfaction of their creditors.
Upon the case as it stands, the pleadings and the evidence, we have no right to say nor suppose that there existed any other motive for the creation of the power than the belief of the parties that by its exercise the fund, out of which alone the debts could be paid, would be materially enlarged. The creditors were perhaps to be delayed, but they were so in order that they might be paid. And it is this power, created from this motive, and intended and calculated to produce this effect, that we are required to say, as conclusive evidence of a fraudulent intent, renders the assignment void upon its face.
This, so long as we are permitted to exercise our own judgment, we cannot say; on the contrary, when we take into consideration the nature and condition of the property assigned, its magnitude, local situation, and wide dispersion, we are convinced that the inference of a fraudulent intent would have been far more probable had the power to sell upon credit, instead of being granted, been expressly denied. A positive direction to sell the whole property immediately and for cash, would have been the worst direction in relation to the interests of the creditors that could possibly have been given, and although it could not probably have been relied on as evidence of fraud, it would certainly have raised and justified the suspicion; while on the other hand, in the actual circumstances of this case, the authority given to the assignee to sell upon credit was so plainly essential to the due execution of his trust, that the omission to grant it might well have been regarded as a breach of moral duty — the duty which tbe assignors owed to their creditors. The whole property of an insolvent debtor, if sold immediately, and for cash, must be insufficient to discharge his debts, for the very term insolvency implies the existence of this fact. If the property is large in its amount, and scattered in its locality, its immediate sale for cash, it is certain, will involve a heavy loss, and, perhaps, looking to the interests to be protected, a ruinous sacrifice; while from the same property, if sold upon credit, with the exercise of ordinary judgment, a sum may be realized equal to its value, *290 and perhaps sufficient to 'meet the demands of the creditors. Hence, in these cases, and they comprehend a large proportion of mercantile failures, it is so manifestly for the interests of the creditors'that the assignees should'havea' discretion as to the time and mode of disposing of the property, that the- assent of the creditors to the grant and exercise of thediscretion, if necessary to render them valid, upon a general principle of law should be presumed;- and upon the same principle, even when the discretion is not given in terms, its existence should be implied. It is doubtless upon this ground that the superior court of Massachusetts'has decided that the assignees of an insolvent debtor have an implied authority to sell upon credit, and Chancellor Walworth; in a case to which we shall hereafter refer, has expressed a similar opinion. (Neally v. Ambrose, 21 Pick. 185; Hopkins v. Ray, 1 Metc. 74.) If the law says that the authority, as necessary and beneficial, is given by implication, we shall not commit the absurdity of saying that it is illegal and fraudulent when given in terms.
When a fund, which is tó be distributed among several persons as cestuis que trust, is to be realized from the sale of' property, real or personal, that it is expedient to give to the trustee a discretionary power of selling upon' credit, is a principle that has long been established in the practice of courts of equity. When such a'sale' is made under a'decree, the power is usually given, and its insertion in an order for thé sale of real estate by a' receiver, is considered by counsel and by judges as a matter of course.’ Nor is it merely in the practice of the courts that the principle has been sanctioned.: It has the direct sanction of the legislature.1 "Thus, where a sale of real estate, for the purpose of satisfying the debts of a testator or intestate, is ordered by a surrogate, the executors ■ or administrators making the sale, are expressly authorized to give a credit, not exceeding three years, for three-fourths of the purchase money; (2 R. S. 105, § 28, 2d ed. p. 43;) and in citing this instance, we remark that it seems to us impossible to state a rational distinction between the rights of the creditors of a deceased person, and those of the creditors,, of a living insolvent ;■ or to explain why the rights of the latter *291 should be deemed to be violated by a sale upon credit, and those of the former to be protected and preserved.
It has, indeed, been said, that the creditors of a living insolvent have'an absolute unconditional right to the immediate application of his property, by its conversion into money, to the payment of their debts; but we are not aware that any who have asserted this doctrine, have attempted to show why the right of the creditors of a deceased insolvent, to the immediate application of his property by the same process, and for the same purpose, is not just as absolute and unconditional. If, in the last case, a sale upon credit is proper to be allowed, for the purpose of obtaining a higher price for the property, and thereby securing a fuller satisfaction of the' debts, no reason has been, nor, we venture to affirm, can be given why, upon the same grounds, it should not be allowed to the former. Nor is that which we have cited the only case in which the propriety of giving to trustees a discretionary power of sale, has been recognized by the legislature. This discretion, in relation to sales of real estate, subject to a limitation as to the period of credit, is given to the statutory trustees of the estates of all non-resident, absconding, and insolvent debtors; and although the trustees have no power to sell the personal property upon credit, yet the immediate sale of the whole is not required; but dividing it into lots or parcels, the trustees are authorized to sell from time time, as they may deem expedient; thus giving the sanction of the legislature to a temporary delay, and imposing no limits upon its duration, and proving conclusively, that the power of creating a delay, with the sole design of increasing the fund for the payment of debts, so far from operating as a fraud upon creditors, is, in the judgment of the legislature, necessary to their protection against that sacrifice of value, to which an immediate sale would probably lead. (2 R. S. 435, § 5.)
The perfect analogy that we here find precludes the necessity of further remarks, and puts an end to this branch of the argument; and we close it, impressed with the conviction that a court of justice has no right to say that a debtor who has conveyed his property in trust for his creditors, intended to hinder, *292 delay, or defraud them, by giving that discretionary power to a trustee, which the legislature has in effect declared that all trustees for the benefit of creditors ought to possess. Had our own views upon the question we have discussed been widely different from those we have expressed, we deny that, as judges, we could have been justified in making them the basis of a decree in opposition to this declared sense of the legislature. It is true, that in all the instances we have quoted, the power to sell upon credit is confined to sales of real estate; but the arguments that are urged to prove the illegality of the power, do not at all depend upon the nature of the property to which it relates. If these arguments are valid at all, they apply with equal force, whether the power relates to real or personal estate; and if, when limited to the real, it is no evidence of a fraudulent intent, it certainly is not rendered so by its extensipn to the personal; nor has it been asserted or intimated that such a distinction exists. In a case in the court of appeals, to which we shall hereafter advert, and' which has been pressed upon us as an authority not to be resisted or evaded, the power which, it is said, was adjudged to be invalid, related exclusively to the disposition of the real estate. The deed which was set aside as fraudulent, embraced only the lands of the debtor.
So far it has been conceded, that a delay of the creditors is a necessary consequence of sales upon credit, and hence that the intent to delay them may be justly inferred from the grant of the power; but the concession, (which has been made solely to enable us to expose more completely the unsoundness of the proposition that we deny,) goes far beyond the facts. A delay in the payment of the debts is not a necessary effect of sales upon credit, and a grant of the power to make such sales is, in reality, no more evidence of an intent to delay creditors, than of an intent to defraud them. It is true that the power to sell upon credit may be abused, and so may every other power vested in a trustee- but we have no right to presume that an abuse of the power was intended or will occur; on the contrary, we are bound to presume that it will be fairly exercised, *293 and with ordinary prudence and judgment, and that it was with this intent and expectation that it was originally granted. Hence, when sales are made upon credit, we must presume that adequate security for that portion of the purchase-money for which credit is given will be taken. The assignee is not bound to suspend the payment of dividends until the securities he has taken arrive at maturity, and their amount is collected. He may, without delay, convert them into cash, by sale or otherwise, and in many cases with little abatement from their value; and it is this course which he is bound to follow whenever the interests or the wishes of the creditors require it. Now, it is quite certain as a general rule, that there is much less difficulty in raising money by the transfer of good securities, real or personal, than by the sale of the property upon which they are founded; and it is equally so, that advantageous sales upon credit may frequently be made, when an immediate sale requiring the whole consideration to be paid in cash, would be impracticable. The result of these observations is, that while by judicious sales upon credit a higher price will be obtained, so, by the transfer of the securities, the assignee will be placed in funds more expeditiously than if the terms of the trust, taking from him all discretion, had compelled him to sell immediately, and for cash. The dividends of the creditors will not only be larger, but will be sooner paid.
And here, if the question were to be determined upon principle alone, we might close the entire discussion; but if the counsel for the plaintiffs is right, the reasons that we have given, whatever force might otherwise be allowed them, are overborne and set aside by the paramount authority of a recent decision, the decision of the 'court of appeals in Barney v. Griffin, (2 Comst. 365.) The question in this case arose upon a convey-" anee of real estate in trust for the payment of certain specified debts, and the objections to the validity of the deed were, First, that the trustees, after selling so much of the property as might be sufficient to satisfy the debts secured, were to re-convey the residue to the debtor, thus excluding the general creditors; and second, that the trustees were empowered to sell upon credit. *294 Mr. Justice Bronson delivered the- jud-gment-.of the-court; and it is not to be denied that the plain import óf his language is, that upon both the grounds that have-been stated, the conveyance was adjudged by the court to be fraudulent and void. His opinión really seems to admit of no other construction. • The reporter, however, iñ his preliminary notes, makes an important distinction. He states the position, that -an assignment of an insolvent estate is wholly void when- it confers authority -to sell upon credit, as held by Bronson, J.; but places the judgment of the court exclusively upon the other ground, the illegal reservation of the surplus. We should have -doubted -whether the statement of the reporter could have been regarded by us,- had not satisfactory evidence been placed- in our hands since the hearing, that it was made upon the authority of Mr. Justice Bronson himself. It by no-' means follows, that the views of this learned judge were rejected by his brethren ; -but it is certain that they withheld their assent, and never meant to affirm them by their decision. Hence the authority-that has been relied on as paramount and controlling, shrinks when examined, from an. adjudication of the court, into an opinion, unauthorized by his associates, of a single judge.- The eminence of Mr. Justice Bronson as a jurist is confessed by all, and his-opinions upon every question that he examines, are -entitled to great respect; but they have no obligatory force, nor in the discharge of our own duties, can we follow them, except so -far as the reasons which he gives, and the authorities which he cites, command our assent. The reasons which he.gives for his opinion in Barney v. Griffin, are those which we have examined and found ourselves compelled to reject; and he refers to no other- authority than the incidental remarks of Chancellor Walworth, in Meacham v. Sternes, (9 Paige, 405.) These observations of the chancellor, however, have no reference to a mere authority to sell; they relate to a positive direction, and this, a direction not to sell upon credit, but by retail -in continuance of the -business of the debtor; and we have the personal authority of the chancellor for saying that his -remarks in Meacham v. Sternes have never been understood by him as conflicting with, and far *295 less were they intended to overrule his: own.prior and deliberate judgment in Rogers v. De Forest, (7 Paige, 272,) a case which seems not to haye been cited in the' court of appeals,, and probably for that reason escaped the attention, of. Mr. Justice , Bronson.
In Rogers v. De Forest, there .were several assignments, comprehending all the real and personal estate of the debtor.; but the questions that were raised and decided seem to have related solely to. the construction and validity of a conveyance pf real estate upon trust, to sell or mortgage the same for the benefit of. creditors, with a power to, the trustees to sell upon credit. The objection founded. ppon the discretionary power of sale, the chancellor .distinctly overruled, upon, the grounds that the power expressed no more than was usually implied,, and that it tended in no degree to-hinder,, delay, or defraud, the creditors, But the trust to mortgage was, in his judgment,. unauthorized, by the statute, and inseparable from the trust to sell, and upon, this ground he decreed the conveyance, to be void. The case was afterwards. carried to the court of errors,- and is reported under, the title of Darling v. Rogers, 22 Wend. 483. A different construction was given to the deed in that court, It was there held, that the trust, to sell and the trust to-mortgage were distinct and independent, and that the admitted legality of the first was not at, all affected, by the invalidity of the second. The decree of the chancellor was therefore reversed, and the deed,, with the exception of the trust to .mortgage the property, adjudged to be a valid, and effectual conveyance for the purposes intended. The counsel for the defendant remarked, that although the decree, of the chancellor was reversed, yet his opinion that the validity of the deed was not affected by the authority given to the trustees to sell upon credit, was, by a necessary implication, adopted and affirmed; since, if the court of errors believed this opinion to be erroneous, it followed inevitably that the deed was void,, and the decree of the chancellor, instead of being reversed, must therefore have been affirmed.;
The observation .is perfectly just, if the question was argued *296 at all in the court of errors; but it does not appear from the report, that such was the fact, and we are therefore not prepared to say that a decision, corresponding with the opinion of the chancellor,' is necessarily involved in the decree finally pronounced. If the question was raised in the court of errors, the decree in Darling v. Rogers has settled the law; and if it was not raised, a position for which the able counsel for the respondent had strenuously contended in the court below, was abandoned in the court of last resort, from the conviction that it was so plainly unreasonable and untenable as to leave no room for a hope that it would be finally established. Upon either supposition, the decree in Darling v. Rogers, taken in connection with the previous and positive decision of the chancellor, is regarded by us as an authority to which our own adverse opinion, had- such been entertained by us, must have been surrendered.
Our decision is, that the provisions in the general assignment from the partners to D. Leavitt, by which he is authorized to sell and dispose of the estate and property assigned, at such time or times, either at public or private sale, and for cash, or upon credit, or partly for cash and partly upon credit, and under such terms and conditions as he may deem reasonable and proper, furnishes no evidence, conclusive or presumptive, of an intent to hinder, delay, or defraud the creditors of the firm, or of the individual partners, and therefore furnishes no ground for impeaching the validity of the assignment.
It may be thought that we have bestowed a very needless amount of care and labor in the examination of the question we have decided; but it would be a great mistake to suppose that the parties before us are alone interested in its decision. It is a question that affects widely and deeply the interests of the community in which we live. There are strong reasons for believing that a very large amount of real property in this city is held under titles derived from the trustees or assignees of insolvent debtors, created by voluntary assignments, in which as large, or nearly as large, a discretion is given to the assignees *297 as to the time and mode of disposing of the property, as is contained in the provisions of the instrument now before us.
It is known to every lawyer of experience, that for a period going as far back as the memory of the oldest of us can reach, it has been usual in this city to insert such provisions in the assignments of insolvent estates; and when we call to mind the number and thé magnitude of the mercantile failures terminating in such assignments, that have occurred during the last twenty years, we shall hardly venture to estimate the present value of the property which they have operated to transfer. ■ It may be, that in many, perhaps in a majority of these instruments, an express authority to sell upon credit is not given; but in all, (for the exceptions are too few to weaken the force of the assertion,) the assignees are authorized to sell the whole or any portion of the property assigned, at public or private sale, or from time to time, or at such time, and in such manner, or under such terms and conditions, as they may deem reasonable and proper •, and it is manifest, upon a very slight consideration, that wherever these or other expressions of equivalent import are used, the assignment is liable to be impeached, exactly upon the same grounds, as when an authority to sell upon credit is given in terms.
The effect in all these cases is to give to the assignees a discretionary power, by the exercise of which, the creditors must, or may be delayed, and from the grant of which, the intent to delay them must therefore be inferred. If it be true, as has been confidently asserted, that when an assignment is made in trust for creditors, they have an absolute and unqualified right that all the effects and property assigned shall, without delay, be converted into cash by an actual sale; and that every assignment which contains a provision by which this right of the creditors is, or may be, violated, is, upon its face, fraudulent and void, it may be seriously doubted, whether a single assignment is to be found upon our public records that would endure the application of the test. Befiecting upon these facts, it is impossible to think, without much solicitude, of the extent to which *298 the security of titles in this city will be affected and shaken, if the doctrine which the recent decision in the court of appeals is supposed to have established, shall ultimately prevail; for it must be remembered, that when a deed, which is a known source of title, is void upon its face, the defence of a purchase without notice is of necessity excluded. It is unnecessary, and perhaps would be inexpedient, to dwell further upon these topics; but we shall be- understood, and expect to be believed, when we say that it is not from any private or selfish motives that we anxiousfy desire that the decision which we have now pronounced shall be confirmed; and hence it is that we have not shrunk from-the labor of placing the members of the higher court, to which this cause will doubtless be carried, in full possession of the reasons by which we have been governed.
II. We pass to the next objection to the validity of the assignment, and the last which it will be necessary to consider. It is, that by the terms of the instrument, the assignee, David Leavitt, is enabled to apply the partnership assets to the satisfaction of debts due to him, not from the firm only, but from either of the partners; thus giving to him an unlawful and fraudulent preference as a creditor of the partners individually, over the creditors of the firm. It is not pretended, that this provision, without extrinsic proof, would render the assignment void upon its face. It is not asserted, that it is in itself conclusive evidence of a fraudulent intent; but on the contrary, it has been very properly admitted, that if no debts were owing to the assignee from either of the partners individually, at the time of the execution and delivery of the assignment, this provision is simply nugatory, and no more affects the construction and effect of the instrument than if it had never been inserted. It is, however, contended, that a large debt, exceeding $20,000, was due to the assignee, from one of the partners, J. W. Leavitt, individually, and that this fact, by giving effect to the objectionable provision, completes the evidence of a fraudulent intent, which vitiates the assignment.
We shall first state the principles of law upon which the ob *299 jection is founded, and then advert, so far as may be necessary, to the facts, as they appear in the evidence.
It is an established and a very just and reasonable doctrine, that-when a partnership becomes insolvent, all its assets, using the term in its largest sense, must be applied exclusively in the first instance to the payment of the partnership debts, so as to confine the remedy of the separate creditors of each partner to the share of their debtor, in the surplus that may remain after the debts of the firm shall have been satisfied. It follows, that where by a preference given to - separate creditors in an assignment of partnership property, the priority of the partnership creditors is sought to be defeated, they have an unquestionable title to relief in a court of equity; but the principle upon which relief- is to be granted, and the nature and extent of the relief itself will be found to depend upon the construction which the law gives to the. instrument of assignment. If the provision giving the preference must be regarded as evidence of an intent to defraud creditors, within the true meaning of the statute of frauds, it is a necessary consequence that the instrument is wholly void, and may be set aside, as in all other cases which the statute reaches, at the instance of judgment-creditors who, by setting it aside, will acquire to themselves a prior' right to the satisfaction of their debts out of the property assigned; but if the provision, as not implying a statutory fraud, is to be construed merely as an infringement of the equitable rights of the partnership Creditors, although as illegal, it is void, yet it is only in a suit in the name and on behalf of the creditors, whose rights, as a class, are affected, that the illegality can be declared; nor will the construction or validity of the whole instrument be any further altered than the protection of their rights may require.
It is the latter construction that we adopt as the most reasonable in itself, and by which alone the rights of the partnership creditors can be effectually protected. The whole doctrine in relation to their rights has not been yet stated, and it is the entire doctrine that must be borne in mind in determining the nature of the relief to which partnership creditors, where an assignment prejudicial to their interests has been made, are entitled. *300 The doctrine of equity is, not only that the partnership property and assets are a trust fund, out of which the partnership debts are to be first paid; but that; in the distribution of the fund, these debts, without regard to the form of the securities, not constituting an actual lien, held by the creditors, are to be ratably paid; (Hutchinson v. Smith, 7 Paige, 26, 1 Story Eq. § 675;) and consequently, where this trust fund is to be secured for the benefit of the creditors to whom it equitably belongs, this proportional equality amongst themselves, is just as necessary to be preserved, as their priority over the separate creditors of the individual partners; and it is manifest, that it can only be preserved by holding that they alone are entitled to impeach an assignment, which violates their rights by attempting to misapply the fund to which their equity as a class had attached.
. It is evident, that it is only by a decree in such a suit, that the fund can be properly secured and properly distributed. If a judgment-creditor can obtain a decree setting aside an assignment of partnership property as void under the statute, upon .the sole ground of a preference which it gives to creditors of individual partners, the effect of his decree is the satisfaction of his judgment out of the property ássigned, and he obtains his satisfaction when the whole property is insufficient to discharge the partnership debts, at the expense of the very creditors whose rights the court, in giving him a decree, affects to vindicate, and whose equitable title to the whole fund had attached, as a vested right, before his judgment was recovered. That such a decree would be inequitable and unjust, it seems impossible to doubt; and a construction which tends to this injustice, if we are not otherwise compelled to- adopt it, we are bound to reject. When it is stated that a preference given to creditors of an individual partner is illegal, it is admitted that the equity which it violates, the equity of the partnership creditors, that the property assigned shall be considered as a trust fund for their joint and equal benefit, existed and had attached when the assignment was made, and this prior equity is just as certainly violated by a preference subsequently given to a judgment-creditor, as by the preference given in the assignment. It is a preference, however, to which *301 the judgment-creditor is certainly entitled, if that given in the assignment must be considered as evidence of a fraud, rendering the instrument void under the statute.
On the other hand, by considering the illegal preference, not as a statutory fraud, but simply as a violation of an equitable right, a construction may in all cases be given to the assignment, by which the rights of the partnership creditors will be fully protected, and the distribution, according to the rules of equity, of the fund to which they are entitled, be secured and enforced. If the assignment giving a preference to debts due from the partners individually, contains "a general trust for the partnership creditors, it is plain that the favorite object of the court of equity, the security and equal distribution of the fund, are at once obtained, by holding the trust to be valid and the preference only to be void. But when the assignment devotes the whole property to the exclusive payment of separate debts, the illegality which runs through all its provisions of necessity vitiates the entire instrument; yet to permit a judgment-creditor to set it aside, in a suit prosecuted by him solely on his own behalf, would be just as inequitable as to annul for his benefit an express trust, when such a trust is'created; and this injustice can only be prevented by holding that the suit for setting aside the assignment must be brought in behalf of all the partnership creditors, so as to enable the. court, by its decree, not only to forbid the intended misapplication of the property, but to appropriate and apply it, according to its own rules, to the use of those to whom it equitably belongs.
It has, indeed, been doubted whether a partnership creditor, who has not obtained a judgment, can maintain a suit to prevent a misapplication, of the partnership property, even when the firm is admitted or proved to be insolvent; but the doubt has been resolved, and we think properly and wisely resolved, by the decision of Chancellor Walworth, in the case of Innes v. Lansing, (7 Paige, 583.) It was decided in this case that such a suit was maintainable by a general creditor of an insolvent partnership, and the partners were accordingly restrained by an injunction from receiving or disposing of the assets of the firm. *302 It is true that the partnership was special, but we entirely agree with Mr. Justice Edmonds, (Dillon v. Storm, 5 How. Pra. Rep. 35,) that this circumstance creates no material distinction, and that the principle of the decision is just as applicable to a general as to a special partnership. When the partnership becomes insolvent, all its assets are converted into a trust fund for the payment of all its debts, just as certainly in the one case as in the other. In both cases the trust arises as soon as the insolvency exists, and no reason is perceived why a creditor, who is a cestui que trust, has not an immediate right, as in every other case of a trust, to invoke the aid of the court, so far as the protection of his interests may require.
It is the existence of the trust that gives a title to the remedy, and it would be a legal solecism to say, that when a trust is admitted or established, the aid of a court of equity, if necessary to enforce its execution, can be withheld; and"it is manifest that the necessity for this aid is never more stringent than when a malversation of the property or fund which the trust embraces, is attempted or threatened. It is true that the act of partners, who attempt, by an assignment, to divert the partnership property and assets from their just and primary application, to the payment of partnership debts, as unconscientious and unjust, may, without violence, be termed a fraud; but it by no means follows that it is such a fraud as the statute contemplates, so as to require any other construction to be given to the act than such as the protection of those whose rights it violates, may render necessary. The fraud which the statute contemplates, affects all - the creditors to whom a preference is not given, and it consists in the intent of the debtor, manifested by the provisions of the instrument, or by extrinsic proofs, either to withdraw the property assigned, wholly, or in part, from its just application to the payment of his debts, or by retaining a control over it by himself or his trustees, to coerce his creditors into such a settlement, as, with a view to his own advantage, he may dictate ; (Grover v. Wakeman, 11 Wend. 207;) but it is plain that no such fraudulent intent exists in the minds of partners who devote their whole property absolutely and uncondi *303 tionally to the payment of their debts, and commit no Other wrong than that of'giving to some of-their'creditors a'preference which the law forbids.
It is true,'that' where- a -preference is given,'it may in one sense be termed an intentional'fráud'upon those' creditors to whom it- is-denied; since its effect may'be to exclude them from any share whatever in the proceeds of'the assignment, and thus entail -upon them the loss of their entire demands." But'if 'the possibility or probability :of this consequence were regarded as evidence of an intentional fraud,-within the meaning of the statute, no assignment in which a preference is given'would be permitted to stand. The statute would condemn them 'all, since in all cases where a preference is given,' the consequence of a resulting loss to the creditors postponed is possible, ih nearly all is probable, and in-many if is known-to the parties,' that a loss, even total, must ensue; yet, even-this certainty is not permitted to affect the validity of the-assignment, when the preference is given by individual debtors to individual creditors, or by partners to the creditors of the firm.
The conclusion is necessary and obvious,' that the law, by allowing preferences in' any case, has,' in effect, declared, that they involved no fraud which the statute' prohibits; and it is therefore certain,' that in those cases in which they are illegal, they are rendered so, not by the operation of the statute, but by the force and application of an independent rule of law. The distinction as to the effect of an - illegal clause or provision, as contravening a statute or a rule: of the common law, is established and familiar.- In the first ease, the taint of the illegality spreads over and corrupts the entire instrument; ■ in the second, it 'is limited to the particular clause, leaving the instrument in other respects as valid and sound as if that clause had never been inserted.
- We pass to'a brief-examination' of the few-cases to be found in the 'books which':have : any bearing upon the question we have discussed. New as they are, they are not easy to be reconciled; yet, if we mistake not, there is a decided weight of au *304 thority in support of the positions that we have taken. The earliest case in which the question seems to have been agitated is Grover v. Wakeman, 4 Paige, 23; in error, 11 Wend. 202. One of the grounds upon which an assignment made by partners of- partnership property was assailed as fraudulent, was a preference given to a debt, alleged to be a private debt of one of the partners. The chancellor being strongly convinced that the assignment was void upon other grounds, declined to give an opinion upon the question, which he stated as doubtful and important ; whether such a preference as illegal, is simply void, or renders invalid the whole assignment. And in the court of errors, Mr. Justice' Sutherland, for the. same reasons, followed his example. Mr. Justice Edmonds, however, who was then a member of the court as a senator, expressed with much clearness and force, the opinion, that the preference was not evidence of an intentional fraud, vitiating the assignment, but if void at all, was only so as inconsistent with the equitable doctrine which makes the assets of a partnership the primary fund for the payment of its debts. He embraced in his remarks some of the topics upon which we have insisted. The question was next raised in Hutchinson v. Smith, (2 Paige, 26,) but the case cannot be said to have turned on its decision. It was there held by Chancellor Walworth, that the debt to which a preference had been given, was in reality a partnership debt; but he also held, that if the debt had been a separate debt of one of the partners, the assignment would only have been so far void as it provided for its payment. This cannot be regarded as a mere obiter dictum. The question had now been twice argued before him, and he had doubtless been led to bestow upon it an attentive consideration. It is therefore probable that the opinion which he expressed was the result of his mature reflections ; and it shows that the doubt which he evidently felt in Grover v. Wakeman no longer existed.
The most recent case is Kirby v. Schoonmaker, (3 Barb. Ch. R. 46,) and as the whole controversy turned upon the question, we have now an express and positive decision. The bill was filed by a judgment-creditor of a partnership to set aside an assign *305 meut of all its effects, upon the single objection, that it gave a preference in payment to those debts which, upon its face, were due from the partners individually. The chancellor stated the question to be, whether the preference was evidence of an intent to defraud creditors, which of necessity, by avoiding the assignment, would entitle the plaintiff to relief, or whether it was only to be regarded as a violation of the equitable rights of the partnership creditors as a class; remarking, that upon the latter supposition, it was only upon a bill in behalf of all those creditors that relief could be granted. He then examined the question of fraudulent intent, and arriving at the conclusion that it could not be deduced from the provisions of the assignment, he sustained it, and dismissed the bill.
The next case, Washburn v. Bank of Bellows Falls, (19 Ver. R. 279,) has no authoritative force as a precedent; but as a decision of the supreme court of Vermont, reversing a decree of the chancellor of that state, it is entitled to much consideration and respect. The opinion of Mr. Justice Redfield, who- delivered the judgment of the court, is in no ordinary degree perspicuous and able. He examines preceding cases with skill and judgment, and the reasoning which leads him to his conclusions, commands our fullest assent. The case was not that of an assignment by insolvent partners, yet it involves the whole doctrine of the relative rights and remedies of partnership and separate creditors. The defendants, as separate creditors of one or more of the partners of an insolvent firm, had issued attachments which had been levied upon the partnership property and effects, and the plaintiffs, as partnership creditors, had subsequently attached the same property. It seems, that by the law of Vermont, attaching creditors are entitled to be paid in the order in which their attachments are levied, and hence the plaintiffs seem to have been driven to the necessity of filing their bill, in order to secure the priority to which, as partnership creditors, they were entitled. The bill was, however, very properly filed by them, not only in their own names, but on behalf of all the partnership creditors, and it prayed that the defendants might be restrained by injunction from any further *306 proceedings upon their attachments, and that- all the property attached should be sold under the order and by the direction of the court, and the proceeds be applied, in the first instance, to the payment of the partnership debts, claiming themselves, however, a preference over the other partnership creditors, by virtue of their own attachments. The court granted substantially the relief that was sought; but holding that the plaintiffs had gained no preference by their attachments, directed them to be paid, pari passu, with the other creditors of the firm. The partnership debts were to be first paid, but were to be ratably paid, and thus the doctrine of equity in relation to the rights of partnership creditors, priority over other creditors, equality among themselves, was carried into effect in its whole extent. It is needless to say how entirely this decision corresponds with the views we have expressed, and to which we had been led by our previous reflections and research.
So far there is an entire harmony in the cases, but the concert is broken by the two we shall next cite, which are those upon which the,plaintiff’s counsel relied. In Robb v. Stevens, (1 Clarke, Ch. R. 192,) the bill was filed by some of the general creditors of an insolvent firm, to set aside or to be otherwise relieved against an assignment of the partnership property, in which the partners had given preference to separate creditors, and the vice-chancellor of the eighth circuit dismissed the bill, upon the ground, that such a bill could only be filed by a judgment-creditor, after the return of an execution unsatisfied. The learned judge seems to have placed this decision upon the ground, that the doctrine of equity that partnership assets must be applied in preference to the payment of partnership debts, is only true as between the parties themselves, and that the partnership creditors can only take advantage of the rule to reach the property through the equity, and therefore with the consent of an injured or dissatisfied partner.
But we wholly dissent from a doctrine which, if admitted to be true, would prove, that when the partnership assets are diverted to the payment of the separate debts of an individual partner by á concurrent act of all the partners, the partnership *307 creditors are without remedy in law or in equity. It is true that the doctrine derives much support from the language of text writers, and in some cases of judges; but it is wrong in principle, and is inconsistent with numerous cases. Indeed, the falsity of the doctrine is implied in every case in which the question as to the effect of a provision in an assignment made by all the partners, giving a preference to separate creditors, has been raised, for unless there is an equity belonging to partnership creditors, which such a preference violates, wholly independent of that which subsists between the partners themselves, it is plain that no such question could have arisen. The preference, if there is no independent equitable right which it infringes, is perfectly legal.
The next case, Jackson v. Cornell, (1 Sand. Ch. R. 318,) is the only one that has created any difficulty in our own minds; for in*this, the vice-chancellor of this circuit certainly decided, that an illegal preference, as an intentional fraud, vitiated the entire assignment. But it is to be observed, that the assignment in this case was made by an individual partner of his separate property, and that the illegal provision was a preference given to partnership creditors over the separate creditors of the assignor. Now, it is true, that in equity the separate property of a partner is considered as the primary fund for the payment of his separate debts, just as the partnership property for those of the firm; but we know not that the separate property of a partner, even when he is insolvent, has ever been considered as a trust fund, which, as such, chancery can reach and administer, and if not, perhaps the vice-chancellor could not have relieved the separate creditors by any other decree than that which he pronounced. It is true, that if the assignment contained a general trust for the separate creditors, he might have protected their interests by upholding the trust, and holding the preference to be void; but to this question, it is evident, from his opinion, that his attention was not at all directed. At any rate, this decision, if it is really in conflict with that of the chancellor, in Kirby v. Schoonmaker, must be considered as overruled.
Our conclusion is, that the objection to the validity of the- *308 assignment, founded on the application which it authorizes of partnership assets to the payment of debts due from the partners individually to a preferred creditor, is groundless in law, and that admitting that the authority so given, as illegal, was a fraud upon the partnership creditors as a body, still the plaintiffs, who sue only as judgment-creditors, have upon this ground no title to relief.
Having arrived at this conclusion, it is unnecessary to examine in detail the remaining questions connected with this branch of the case, since, if we have now made a right decision, these questions are wholly immaterial; but as we may have erred, and it may be thought desirable by the parties that our views upon these questions should be expressed, we shall proceed briefly to state them.
It is certain that when the assignment was made, J. W. Leavitt was personally indebted to the defendant, D. Leavitt, in the principal sum of $19,000, secured, in addition to his bond, by two separate mortgages, one of $15,000 upon a house and lot in Barclay-street; and one of $4,000 upon his house and farm at Weehawken, in New Jersey; but it is also certain, and not denied, that this debt was in its origin a partnership debt, and arose from moneys which D. Leavitt had from time to time advanced to the firm, and which had been used by the firm in its proper business. It is a mistake to suppose that a partnership debt, although resting in simple contract, is merged and extinguished when a higher security is taken from an individual partner; on the contrary, the presumption of law is, that the new security was intended to be collateral, and this presumption can only be repelled by positive proof that it was accepted by the creditors in full satisfaction of the existing debt.
We have considerable doubts whether the necessary proofs of such an acceptance by D. Leavitt has been given, but we incline to think that the surrender by him of the notes of the firm would be deemed sufficient in a court of law, and be held to have extinguished the prior debt. But we are very clearly of opinion, that although it may have been satisfied in law, it was *309 still a subsisting partnership debt in equity, and by this we mean that not only a moral obligation to pay the debt still rested upon the conscience of the partners, but that a court oi equity, in distributing the assets of the partnership, would have been bound to acknowledge its validity and enforce its payment. Upon this point the decision of Lord Thurlow, in Ex parte Clures, (2 Brown’s Ch. R. 595,) and that of Chancellor Walworth, in Hutchinson v. Smith, (7 Paige, 26,) seem to us very applicable and decisive authorities. In each of these cases, a single partner only was known to the creditors as his debtor, and there was no privity of contract whatever between him and the firm, and the debt was held to be a partnership debt, only upon the fact that the money, with the knowledge and consent of the partners, had been applied to the use of the firm, and had not been repaid. If there is any real distinction between these cases and the present, we are unable to state it.
Lastly, upon the supposition that the debt had ceased to be a •partnership debt, in equity as well as in law, we are of opinion that the peculiar circumstances of the case repel any inference of a fraudulent intent; that is, of any intent that the debt should be paid out of the partnership property, to the prejudice of the partnership creditors. The securities which D. Leavitt held from J. W. Leavitt, were not given up, nor meant to be given up, when the assignment was made. And if the debt, in the full sense of the term, was the private debt of J. W. Leavitt, these securities were the primary fund for its payment; and, until this fund was exhausted, D. Leavitt, even under the terms of the assignment, could have no recourse to the partnership property that was assigned to him. He could look to that property only for a deficiency; and there is no reason whatever to suppose that a deficiency was anticipated. The mortgages were doubtless considered by the parties an ample security for the debt, and that they were so is proved by the event; for not only has the entire debt been satisfied from the mortgaged property, but a surplus of $700, resulting from the sale of the N. J. farm, has been credited by D. Leavitt, upon the debt due to him from the firm. In the result, more than $20,000, arising from *310 the separate property of J. W. Leavitt, have been applied to the redaction of partnership debts; so that, in reality, it is only his separate creditors, if there are any, not those, of the partnership, who. have any ground for complaint.
In concluding this opinion, we renew the; expression of our regret, that we are not able to extend that relief to the partnership creditors, to which, upon principles of .equity, had the system of preferences not been unfortunately established, they would be clearly entitled. Setting aside the special provisions in these assignments, in favor of U. Leavitt, and Howland & Aspinwall, we would willingly, had we the power, sustain and enforce the general trusts for the creditors of the firm; and by so doing, convert all the partnership property and effects into a trust fund, for the payments ratably, of the partnership debts. But we have felt, that in order to give effect to o.ur own wishes, we could not listen to objections, to which, we are persuaded, no countenance could ever have been given in any court of justice, had preferences never been allowed; but which, if permitted, to prevail, would render void the most honest, disposition of his property, that a debtor in failing circumstances, can possibly make; namely, its conveyance to. trustees for the equal benefit of his creditors. Had such conveyances alone been sanctioned by the law, that extreme jealousy of insolvent, assignments,' which is so strongly manifested in the more, recent decisions in this state, would never have arisen, nor would there be any reason to fear, that this jealousy was leading to a.revival of the exploded and arbitrary doctrine of constructive fraud. For ourselves, so long as we shall be permitted to act in the exercise of our own judgment, we shall follow the rule that the 'statute prescribes in its plain and obvious sense; and shall never declare an assignment of property made by an insolvent debtor, to be void, unless we are satisfied that the fraudulent intent, which the statute requires to be proved, existed as a fact; not merely as one of those conclusions which judges formerly were accustomed, but we are now forbid, to draw.
In the present case, it is our deliberate judgment, that no fraudulent intent, affecting the validity of the assignment, can *311 be deduced, either from tbe proofs or from tbe provisions of tbe instruments.
It was suggested upon tbe bearing, tbat in tbe event of our sustaining tbe assignments, tbe defendants might be required to account as trustees, and a decree for tbat purpose be now made; but it was settled by tbe court of errors in Cunningham v. Freeborn, (11 Wend. 241,) tbat upon a creditor’s bill in tbe ordinary form, no such decree can be made. It was indeed said by Cb. J. Nelson, tbat where tbe bill is framed with a double aspect, tbat is with a prayer in tbe alternative' for an account, tbe relief may be granted, but be also remarked tbat in such a case all tbe creditors, for whose benefit tbe trust has been created, are necessary parties, and tbe bill must be filed in their behalf \ not merely in tbe names of tbe judgment-creditors. Here both tbe alternative prayer and tbe necessary parties are wanting.
The'bill must therefore be dismissed with costs.